1  Andrew K. Alper (State Bar No. 088876)
   FRANDZEL ROBINS BLOOM & CSATO, L.C.
2  6500 Wilshire Boulevard
   Seventeenth Floor
3  Los Angeles, California 90048-4920
   Telephone: (323) 852-1000
4  Facsimile: (323) 651-2577

5  Attorneys for Creditor California Economic
   Development Lending Initiative
6

7

8                    UNITED STATES BANKRUPTCY COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11  In re                          | CASE No. 10-40075

12  HRMC, INC.,                    | Chapter 11

13          Debtor.
                                   | Date: December 1, 2010
14                                 | Time: 9:30 a.m.
                                   | Courtroom: 220 Judge Randall J. Newsome
15

16
      **CALIFORNIA ECONOMIC DEVELOPMENT LENDING INITIATIVE'S**
17
   **OPPOSITION TO DEBTOR'S MOTION FOR ORDER APPROVING BIDDING**
18
   **PROCEDURES FOR THE SALE OF THE PROPERTY OF THE ESTATE AND**
19
   **RELATED MATTERS AND OBJECTING TO THE SALE**
20

21
         COMES NOW California Economic Development Lending Initiative, a California
22
   corporation ("CEDLI") and hereby files its Opposition to the Debtor's Motion for Bidding
23
   Procedures, the sale process and the auction with respect to the sale of property of the Estate
24
   ("Sale Motion"). This Opposition is based on the following facts and law.
25
                                    I.
26
                              **INTRODUCTION**
27
         As a practical matter, so long as the Debtor sells its assets in accordance with normal
28

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1   procedures under Section 363 in a proper manner and the Debtor and the creditors are not spinning

2   their wheels and incurring needless cost and expense, CEDLI is not opposed to the Debtor selling

3   its assets because it appears that a reorganization is not possible. So the idea of the Debtor having

4   a sale of its assets is not opposed by CEDLI. This, however, is the Debtor's second attempt at

5   going through the bidding procedures issues before commencing the sale. Without getting any

6   notice of a hearing with respect to the Debtor's second bite at the apple on bidding procedures, the

7   Court approved the bidding procedures despite problems with them and allowed the Debtor to set

8   an auction with a stalking horse bid of $300,000.00 to buy the Debtor's assets. But, as set forth

9   below, it appears that the Debtor not only has issues with the bidding procedures but the amount

10  of the sale price may not be sufficient to pay the debt due to secured creditors and the cure

11  payments in this case. Moreover, the alleged cure amounts set forth in the declaration have no

12  substance whatsoever and do not show that the Debtor can sell the assets and pay the debt due.

13  **A.   CEDLI'S LOAN SECURED BY THE ASSETS OF THE DEBTOR**

14       CEDLI made a loan to the Debtor secured by all of its personal property assets in the sum

15  of $250,000.00. As of the date of the filing of this petition, the Debtor was in default of the loan

16  and as of February 22, 2010, the sum of $143,238.81 was due and payable to CEDLI not including

17  attorneys' fees and costs. The loan is secured by a blanket lien on all personal property assets of

18  the Debtor. The facts set forth herein are contained in the Declaration of Ray Mendoza previously

19  filed with the Court on May 14, 2010, and is attached hereto.

20       The Debtor and CEDLI never signed a stipulation to use CEDLI's cash collateral during

21  this case because CEDLI could not get adequate financial information or financial projections

22  from the Debtor. The Debtor never obtained an order from the Court to allow the use of CEDLI's

23  cash collateral. The Debtor just went on its merry way violating 11 U.S.C. § 363 throughout this

24  case and using CEDLI's cash collateral.

25       CEDLI did not take immediate action to deal with the violation of section 363 because of

26  the Debtor's continued representation to CEDLI that the Debtor was in the process of selling its

27  restaurant which would pay CEDLI in full. Moreover, if the Debtor could be believed, the cash

28  collateral of CEDLI at the inception of the case was only $9,941.03 although CEDLI finds it hard

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1 to believe that the Debtor had no inventory (food) at the time the case was filed according to its

2 Schedule B. This cash collateral also assumes that every dollar in the bank was as a result of the

3 use of CEDLI's collateral and were proceeds from the sale of the Debtor's inventory of food.

4 Therefore, CEDLI decided it was not economical for all parties to deal with motions to prohibit

5 use of cash collateral or convert the case or appoint a trustee because of the violations of Section

6 363 to see if the Debtor would actually be able to pay the creditors in full by a sale of its assets.

7 However, CEDLI never consented to the use of its cash collateral and the Debtor never obtained

8 an order of the Court to use it.

9         The Debtor has not paid CEDLI anything during this case. At the present time, the amount

10 due to CEDLI is $160,938.44 together with attorneys fees, costs and interest due.

11       **B.   ISSUES WITH BURGER KING CORPORATION AND CURE AMOUNTS**

12        During this case, CEDLI also learned that Burger King Corporation contends that the

13 Debtor's franchise was terminated prepetition and the Debtor has no ability to sell the restaurant as

14 a Burger King franchisee.  Maybe Burger King Corporation is agreeing to a sale and maybe not.

15 The last Motion for Relief from the Automatic Stay filed by  Burger King Corporation stated that

16 the amount due to Burger King Corporation was approximately $100,000.00 when the attorneys

17 fees and costs were included.

18        The Declaration of Willie Cook filed on November 15, 2010, with respect to cure amounts,

19 never states who the cure amounts are paid to or the basis of the cure amount. CEDLI assumes that

20 the cure amounts for advertising, investment spending and royalty are for Burger King

21 Corporation but this amounts to only $27,966.05 not the $100,000 set forth in the Burger King

22 Corporation Motion for Relief from Stay.  The additional cure amounts are stated in Mr. Cook's

23 declaration include delinquent taxes in the sum of $12,607.67 and rent in the sum of $32,819.90.

24 Assuming these are not Burger King Corporation cure payments, to simply make the cure

25 payments and the sums due to CEDLI, the Debtor's secured lender,  the amount the Debtor must

26 have from a sale is the net sum of $306,366.01 without regard to accruing interest, attorneys fees

27 and costs and accruing amounts due to the landlord and the taxing authorities. The current bid

28 which is the stalkinghorse is only $300,000.00. Therefore, the current bid is insufficient unless one

or more creditors agree to reduce its or their claim. Consequently, this sale may also be doomed because it is insufficient to pay the current cure and secured creditors. Of course, after the sale there will be nothing left for the other creditors in this Estate.

II.

**ISSUES WITH BIDDING PROCEDURES.**

The current bidding procedures have the following issues:

1.      It is never stated that the sale is free and clear of liens with liens attaching to proceeds. This is especially important to CEDLI given that the Debtor is selling its collateral as part of the sale. CEDLI does not at this time consent to a partial payoff to release its liens. Therefore, without this consent, pursuant to 11 U.S.C. §363(f) there is no way the assets can be sold.

2.      The stalkinghorse bid appears to be insufficient as discussed above.

3.      The break up fee is not clear in the Bidding Procedures. The break up fee is defined as either no more than 1% of the stalkinghorse bid or reimbursement of expenses. But is it the greater or lesser of these amounts? The Bidding Procedures are vague and ambiguous in that regard.

4.      On page 6 of the Bidding Procedures it is stated that "no later than two (3) business days following the entry of the Bidding Procedures Order, the Debtor" has certain obligations placed on the Debtor. Is it two or three days?

5.      On Page 9 of the Bidding Procedures, any Qualified Bid shall contain no Break Up fee or expense reimbursement yet on page 6 it is stated that there is a Break Up Fee. This is clearly contradictory.

6.      On Page 10 of the Bidding Procedures, there is a reference to bidding on more than one store yet there is only one restaurant being sold to the best of CEDLI's knowledge.

7.      On Page 11 of the Bidding Procedures, the Debtor states the amount of Qualified Bids yet the amounts as stated may not even exceed the Break Up Fee depending on what that fee is. Therefore, this may be another contradiction.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    8.    Nowhere in the Bidding Procedure or in any motion does it state that any bid will

2  be accepted only if the amount exceeds the cure payments and the liens on the collateral unless

3  consent of the creditors is obtained to sell the assets. Without this admonition, the Bidding

4  Procedures and the Motion cannot be approved.

5

6  DATED: November 16, 2010          FRANDZEL ROBINS BLOOM & CSATO, L.C.

7

8                                    By:

9                                          ANDREW K. ALPER
                                           Attorneys for Creditor California Economic
10                                         Development Lending Initiative

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

# EXHIBIT 1

446629.1

Andrew K. Alper (State Bar No. 088876)
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Creditor California Economic
Development Lending Initiative

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re | CASE No. 10-40075 |
| HRMC, INC., | Chapter 11 |
| Debtor. | **DECLARATION OF RAYMOND MENDOZA IN SUPPORT OF OBJECTION TO ADEQUACY OF DISCLOSURE STATEMENT AND CONFIRMATION OF PLAN BY CALIFORNIA ECONOMIC DEVELOPMENT LENDING INITIATIVE** |
| | [No hearing date set] |

I, Raymond Mendoza, declare as follows:

1. I am employed as the President of CALIFORNIA ECONOMIC DEVELOPMENT LENDING INITIATIVE, a California corporation ("CEDLI"). I am one of the persons at CEDLI that is charged with the responsibility for the collection of the obligations due from the Debtor and Debtor-in-Possession, HRMC, Inc. ("Debtor") and all guarantors of the Debtor. My responsibilities include supervision and control over certain of CEDLI's employees and the bookkeeping procedures of CEDLI. I am required to know and, in fact, am very familiar with the jobs of CEDLI's employees and the methods they use in making bookkeeping entries and maintaining of the records for which I am ultimately responsible.

**Authentication of Documents**

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

2.      I am one of the custodians of CEDLI's records, documents, and writings, as that term is defined in Federal Rules of Evidence, Rule 1001 ("Records") as those Records pertain to the Debtor. I have personally worked with and on CEDLI's Records and have personal knowledge that the Records were and are kept in the usual and ordinary course of CEDLI's business and that the entries therein are made at or about the time of the events recorded by individuals employed by CEDLI who have and had personal knowledge thereof and who have and had a continuing business duty to make those entries and record those events at or about the time of the events recorded. In particular, the following sets forth the procedures used by CEDLI when it handles Records and/or records information regarding loans and how I have become one of CEDLI's custodian of records:

a.      Loan Documents:  Once the loan documents evidencing the transactions between CEDLI and its borrowers and guarantors are executed, they are delivered to officers of CEDLI whose duty it is to put them in the in CEDLI's credit file associated with the loan to a particular borrower and placing the originals of the loan documents in a separate documentation file. The documentation file is placed in a locked fireproof safe in CEDLI's office. An officer of CEDLI with keys must open that safe to allow the documentation file to be removed if it is needed, and this officer also ensures that the Records and the credit file are replaced as soon as the work with the credit file and/or the Records is done. Original loan documents are not removed from the secured location except under the supervision of an officer of CEDLI who is authorized to do so and they are immediately put back in the locked and fireproof location.

b.      Records Other than Original Documents:  CEDLI also keeps a separate credit file concerning each borrower and any guarantors which credit file is also kept in a secured and fireproof location in CEDLI's office. CEDLI's credit file typically will contain numerous documents other than the copies of the loan documents, such as documents received from the borrower or any guarantors including financial statements, tax returns, correspondence, materials about the borrower, and other documents generated by CEDLI in the process of handling the loan, such as credit reports, memoranda, notes, call reports, financial analysis of the borrower and any guarantors, lien searches, title reports, and the like. Some of these records may also be imaged.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1 These Records are also put in the credit file by officers of CEDLI whose duty it is to file and/or

2 generate such Records for the file at or about the time the Records are received or the information

3 is generated and recorded and to maintain such Records in the credit file. These Records are

4 available to officers and employees of CEDLI working on the file, but will only be used by

5 officers or employees of CEDLI who have a business need to have the credit file or to look at the

6 Records and/or information therein. If a Record is ever removed from the credit file, it is replaced

7 as soon as the task is completed that led to the credit file being taken out, and the file then returned

8 to a secured location.

9         c.    Loan History: CEDLI maintains detailed and comprehensive computerized

10 Records of all financial transactions between it and its borrowers and any guarantors. Officers of

11 CEDLI input data into CEDLI's computer system reflecting the loans, borrower's payments made,

12 and other financial transactions, which computer system is specifically designed to record such

13 information, and payments for each particular loan. CEDLI's computer system also tracks whether

14 a loan is current and other loan-related information. Only a limited number of designated officers

15 and employees of CEDLI are authorized by CEDLI to enter the data. Data entry and data changes

16 require the concurrence of a supervisor who is one of CEDLI's officers. Information input to

17 CEDLI's computer system is checked and reconciled the following day for accuracy. Whenever a

18 payment is received on a loan that payment is input within 24 hours of the date and time it is

19 received into CEDLI's computer system by persons authorized, and who have a business duty to

20 CEDLI, to do so in their ordinary course of business.

21         d.    Transfer to Problem Credit Specialist: Once a problem exists in a loan

22 relationship, it is CEDLI's usual and customary practice to transfer the handling of the loan to

23 officers of CEDLI who specialize in the handling of problem credits. In that regard, the credit file

24 is physically transferred to those officers, who keep the file in a locked file cabinet and who do not

25 remove any Records from the credit file without putting such Records back into the credit file as

26 soon as they are finished with the activity that prompted the removal. Alan Daw and I are the

27 primary persons at CEDLI responsible for the collection of the obligations due at this time.

28

703518.1 | 019917-0470

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1    e.    Trustworthiness: The foregoing methods have proven to be an accurate and

2    trustworthy means for CEDLI maintaining Records and recording information about CEDLI's

3    loans and its borrowers, guarantors, and other customers.  These Records are utilized by

4    employees of CEDLI, including me, on a daily basis in the discharge of the normal and ordinary

5    functions of CEDLI and its employees, and such Records regularly are relied upon and are an

6    accurate and proven means of reflecting the current situation with regard to each borrower and any

7    guarantor.

8         3.    If called upon to testify as to the matters stated herein, I could and would

9    competently testify thereto. I have gained personal knowledge of the facts set forth herein both as

10   a custodian of records and because I have been one of the person who has been handling this

11   account as discussed below.  If called upon to testify to the matters stated herein, I could and

12   would competently testify thereto.

13   **Loan Documents**

14        4.    On or about September 7, 2005, the Debtor entered into a loan with CEDLI in the

15   sum of $250,000.00.  Pursuant to the terms of a Loan and Security Agreement the Debtor was to

16   make principal and interest payments to CEDLI commencing October 15, 2005 through and

17   including the maturity date of the loan on September 15, 2012.  Interest payments were to be paid

18   from and after October 15, 2005 through March, 2006 and then both principal and interest in the

19   sum of $3,205.13 plus accrued interest thereon were due thereafter each and every month until the

20   loan was paid in full.  A true and correct copy of the Loan and Security Agreement is attached

21   hereto, marked Exhibit "1", and incorporated herein by this reference.

22        5.    In connection with CEDLI making the loan, CEDLI was granted a blanket lien on

23   all personal property assets of the Debtor including all of the Debtor's accounts, inventory,

24   equipment, chattel paper, general intangibles, proceeds therefrom and books and records related

25   thereto.  The grant of the security interest is set forth in the Loan and Security Agreement.  CEDLI

26   perfected its lien on all personal property assets of the Debtor by filing its UCC-1 Financing

27   Statement on September 8, 2005.  A true and correct copy of the UCC-1 Financing Statement is

28   attached hereto, marked Exhibit "2", and is incorporated herein by this reference.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

6.     The Debtor has not made monthly principal payments to CEDLI for March, 2009, and not made interest payments for the months of October, 2009, and each month thereafter. As of February 22, 2010, the sum of $143,238.81 is due and payable to CEDLI not including attorneys fees and costs. A true and correct copy of the accounting reflecting payments made and amounts incurred through February 22, 2010, is attached hereto, marked Exhibit "3", and incorporated herein by this reference.

**Matters** Occurring **Durnig Bankruptcy**

7.     CEDLI has never consented in writing to the use of its "cash collateral" as that term is defined in 11 U.S.C. § 363. CEDLI has never received an adequate accounting with respect to the use of its cash collateral. CEDLI has never received an adequate budget and therefore no Stipulation for Use of Cash Collateral was ever signed by CEDLI and the Debtor. Thus, the Debtor has continued to use CEDLI's cash collateral during this case without any authority to do so.

8.     Both prior to the filing of bankruptcy and after the filing of the bankruptcy, the Debtor, by and through Willie Cook, has representing to CEDLI that it has been attempting to sell its restaurant with the consent of Burger King Corporation. In fact, prior to bankruptcy, the Debtor apparently had a sale escrow open and the sale fell through. During this case, it was represented that a sale was in process. At no time did the Debtor ever represent to me or to CEDLI that Burger King Corporation was not cooperating them or that the Burger King franchise had been "pulled".

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 13th day of May, 2010, at Oakland, California.

_____
RAYMOND MENDOZA, Declarant

# LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "Agreement") is made as of September 7, 2005, by and between HRMC, INC., a California corporation ("Borrower"), and CALIFORNIA ECONOMIC DEVELOPMENT LENDING INITIATIVE, a California corporation ("Lender"):

A.    Borrower has applied to Lender for a loan in the principal amount of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00).

B.    Lender has agreed to make the loan to Borrower upon the terms and conditions set forth below.

NOW, THEREFORE, for consideration of the within covenants, terms, and conditions, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## 1    SECTION ONE.    DEFINITIONS.

The definitions set forth in the Recitals are incorporated herein by reference. Except as otherwise herein provided, all defined terms shall have the meanings ascribed to them in the California Uniform Commercial Code. For purposes of this Agreement, the following terms shall have the following meanings:

1.1    "Accounts" means all presently existing and hereafter arising accounts, contract rights, instruments, documents, chattel paper, and all other forms of obligations owing to Borrower arising out of the sale or lease of goods or the rendition of services by Borrower, whether or not earned by performance, and any and all credit insurance, guaranties and other security therefor, as well as all merchandise returned to or reclaimed by Borrower and Borrower's Books (except minute books) relating to any of the foregoing.

1.2    "Advance" means any advance or disbursement of a portion or all of the Loan.

1.3    "Agreement" means this Loan and Security Agreement, and any modification thereof.

1.4    "Affiliate" means any person or business entity, directly or indirectly, related to, in control of, controlled by or under the common control of Borrower or Guarantor, or a successor thereof, whether through merger, consolidation, transfer of assets or otherwise.

1.5    "Assets" has the meaning usually given that term in accordance with GAAP, including subordinated debts owed by Borrower to holders of Borrower's Equity, but shall exclude sums due to Borrower from Affiliates.

1.6    "Base Rate" means the per annum rate equal to the greater of (i) three and one-half percent (3.50%) over the Prime Rate and (ii) seven and one-quarter percent (7.25%).

1.7    "Borrower's Books" means all of Borrower's books and records including, but not limited to: minute books; ledgers; records indicating, summarizing or evidencing Borrower's assets, liabilities, the Accounts, Equipment, General Intangibles, Investment Property, Inventory and all information relating thereto; records indicating, summarizing or evidencing Borrower's business

EXHIBIT

operations or financial condition; and all computer programs, disc or tape files, printouts, runs, and other computer-prepared information and the equipment containing such information, and all contract rights with third parties relating to the maintenance of any and all of the foregoing.

1.8     "Borrower's Equity" means (i) if Borrower is a corporation, all capital stock of Borrower, (ii) if Borrower is a partnership, all partnership interests of Borrower (whether general or limited partnership), and (iii) if Borrower is a limited liability company, all membership interests of Borrower.

1.9     "Business Day" means Monday through Friday, excluding any day of the year on which banks are required or authorized to close in California.

1.10     "Chattel Paper" means a record or records that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, a security interest in specific goods, and license of software used in the goods, a lease of specific goods, or a lease of specific goods and license of software used in the goods.

1.11     "Collateral" means all of Borrower's right, title and interest in Accounts, Inventory, Equipment, Investment Property, Instruments, Chattel Paper and General Intangibles, now owned or hereafter acquired by Borrower, now existing and hereafter created or arising, fixed and contingent, and wherever located, and all proceeds thereof including, without limitation, proceeds of insurance and any and all Accounts, General Intangibles, Inventory, Equipment, Investment Property, money, deposit accounts, Chattel Paper, Instruments, and other tangible or intangible property of Borrower resulting from the sale or disposition of any such property, and the proceeds thereof.

1.12     "Debt Service Ratio" is defined as (i) Borrower's earnings (after payment of compensation allocated to owners of Borrower's Equity) before interest and taxes plus depreciation and amortization minus any distribution allocated or reserved for taxes, for the relevant period, divided by (ii) total interest expense plus current portion of long term debt and capitalized lease payments for the relevant period.

1.13     "Deed of Trust" means that certain Deed of Trust with Assignment of Rents of even date herewith given by Guarantor, as trustor, to the Title Company, as trustee, for the benefit of Lender relating to the Residence and securing the guaranty of the Guarantor.

1.14     "Default Rate" means a per annum rate equal to five percentage points (5%) over the Base Rate.

1.15     "Documentation Fee" means the sum payable to Lender at Loan closing to cover Lender's costs of preparing Loan Documents.

1.16     "Equipment" means all of Borrower's present and hereafter-acquired machinery, machine tools, equipment, fixtures, office equipment, furniture, furnishings, motors, motor vehicles, tools, dies, parts, and goods of all kinds and description, and any and all additions, attachments, accessories, accessions and improvements thereto, and all substitutions therefor and replacements thereof; all present and future drawings, blueprints, reports, catalogs and computer programs relating thereto; and all of Borrower's Books relating to any of the foregoing.

1.17 "Event of Default" means any of those occurrences specified in Section Seven, or as otherwise specified in the Loan Documents.

1.18 "Financial Statements" means balance sheets, income statements, reconciliations of capital structure, statements of sources and applications of funds, and true and complete copies of income tax returns (bearing the original signature of the relevant taxpayer), all prepared in accordance with GAAP.

1.19 "Financing Statement" means one or more financing statements (Form UCC-1) given by Borrower to Lender covering the furniture, fixtures and equipment, contracts, loan proceeds, documents, inventory, accounts, general intangibles and all other personal property and/or fixtures owned by Borrower, as described in such Financing Statements.

1.20 "GAAP" means generally accepted accounting principles consistently applied and maintained throughout the period indicated and consistent with the prior financial practice of Borrower, except for changes mandated by the Financial Accounting Standards Board or any similar accounting authority of comparable standing.

1.21 "General Intangibles" means all of Borrower's present and future general intangibles and other personal property (including, without limitation, any and all deposit accounts, choses or things in action, goodwill, patents, trade names, trademarks, copyright, blueprints, drawings, purchase orders, computer programs, computer discs, computer tapes, literature, reports, catalogs, deposit accounts and tax refunds) other than goods and accounts, as well as Borrower's Books relating to any of the foregoing.

1.22 "Governmental Agency" or "Government Agency" means any federal, state or local governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, court, administrative tribunal, or public utility.

1.23 "Guarantor" means WILLIE C. COOK, an individual.

1.24 "Guaranty" means the Continuing Guaranty of Guarantor, of even date herewith, unconditionally and irrevocably guaranteeing the repayment of the Loan to Lender.

1.25 "Indebtedness" means: (a) any and all credit granted and advances, debts, obligations and liabilities of Borrower to Lender under the Loan Documents whether past, present or future, incurred or created, and including those arising under successive transactions creating new obligations after all or any obligations have been repaid, voluntarily or involuntarily and however arising, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined and whether Borrower may be liable individually or jointly with others or whether recovery upon such obligations may be or hereafter becomes barred by any statute of limitations; (b) any and all amendments, modifications, renewals or extensions of any Indebtedness, including, but not limited to, those which are evidenced by a new or additional instrument or agreement or those which change the rate of interest or add or release any obligor on any Indebtedness; (c) any and all interest accruing and payable on any of the Indebtedness at the rates specified in this Agreement or other instrument evidencing the Indebtedness or if no rate is agreed upon, the Federal Discount Rate plus 5%; (d) all amounts advanced or incurred by Lender on account of Borrower under the terms of this Agreement or for the maintenance or preservation of the property pledged herein; (e) all obligations of Borrower arising from any guaranty executed by Borrower in favor of

Lender guaranteeing the debts of another to Lender; and (f) all costs of collection, including, but not limited to, reasonable attorneys' fees, accountants' fees and any other expenses incurred in connection with the protection or realization of the Collateral or enforcement of this Agreement or any instrument or agreement evidencing the Indebtedness, whether or not suit is filed and including amounts incurred in enforcing any judgment in Lender's favor, and any appeal therefrom.

1.26    "Instrument" means a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary endorsement or assignment.

1.27    "Inventory" means all present and future inventory in which Borrower has any interest, including, but not limited to, goods, machinery and equipment held by Borrower for sale or lease or to be furnished under a contract of service; all of Borrower's present and future raw materials, work in process, finished goods, and packing and shipping materials, wherever located; any documents of title representing any of the above; and all of Borrower's Books relating to any of the foregoing.

1.28    "Investment Property" means all of Borrower's present and future investment property, including, without limitation, securities, security entitlements, securities accounts, commodity contracts, and commodity accounts.

1.29    "Laws" means, collectively, all federal, state, and local laws, rules, regulations, ordinances, and codes.

1.30    "Lender's Policy" means an ALTA standard form lender's policy of title insurance in the amount of the Loan issued by the Title Company for the benefit of Lender, as holder of the Deed of Trust, excepting only those conditions of title which are found acceptable by Lender.

1.31    "Liabilities" has the meaning usually given that term in accordance with GAAP.

1.32    "Life Insurance Policy" means, individually and collectively, policies of life insurance upon the life of Guarantor in the minimum amount of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00), issued by one or more insurance carriers duly admitted as life insurance companies in the State of California, having reserves and policy holders ratings acceptable to Lender, in its sole opinion and judgment.

1.33    "Loan" means the loan described in Section Four of this Agreement in the principal amount of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00).

1.34    "Loan Documents" means this Agreement and such other documents as Lender may require Borrower to give to Lender as evidence of and/or security for the Loan.

1.35    "Loan Fee" means the sum of Seven Thousand Five Hundred and No/100 Dollars ($7,500.00), which shall be fully earned by Lender upon the making of the Loan.

1.36    "Loan Proceeds" means all funds advanced by Lender as a Loan to Borrower under this Agreement.

1.37    "Maturity Date" means September 15, 2012.

1.38    "Net Profit " has the meaning usually given that term in accordance with GAAP.

1.39    "Organizational Documents" means, if Borrower is other than a natural person, the duly filed, certified and/or executed documents or instruments evidencing or confirming the lawful formation and existence of Borrower, Borrower's bylaws, and all written consents and certifications required by Lender from persons having management and/or ownership interests in Borrower.

1.40    "Person" means an individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization or a Government Agency.

1.41    "Prime Rate" means the variable rate of interest, on a per annum basis, published in the Money Rate Section of the Wall Street Journal as the Prime Rate, or if the Wall Street Journal ceases to publish such a rate, then such other rate as may be published by a comparable publication as Lender may choose in its sole discretion. The Prime Rate may vary from time to time and the interest rate shall automatically change on the same day the Prime Rate changes.

1.42    "Property" means those certain properties which the Borrower maintains Borrower's offices and conducts Borrower's business, including, without limitation, the real property commonly known as 817 Delaware Street, Berkely, California 94710.

1.43    "Residence" means the land and improvements, commonly known as 2320 9th Street, Berkely, California 94710. The Residence is more fully described in Exhibit "A".

1.44    "Section" means a numbered or lettered paragraph, sub-paragraph or other division of this Agreement, and all references in this Agreement to a Section (other than references to statutes) are to Sections of this Agreement.

1.45    "Subordination Agreement" means, individually and collectively, those certain Subordination Agreements, in form and content as may be required by Lender in its sole opinion and judgment, executed by Willie C. Cook ("Cook") and Gurmail Chaggar ("Chaggar"), unconditionally and irrevocably subordinating debts of Borrower to Cook or Chaggar, as applicable, to all indebtedness and obligations of Borrower to Lender.

1.46    "Title Company" means Chicago Title Company.


2    SECTION TWO.    INTERPRETATIONS

2.1    ACCOUNTING TERMS.    All accounting terms not specifically defined herein shall be construed in accordance with GAAP consistent with those applied in the preparation of the Financial Statements referred to in Section 6.14 and all financial data submitted pursuant to this Agreement shall be prepared in accordance with such principles.

2.2    USE OF DEFINED TERMS.    Any defined terms used in the plural shall include the singular and such terms shall encompass all members of the relevant class.

2.3    SCHEDULES AND EXHIBITS.    All schedules and exhibits to this Agreement, either as originally existing or as the same may from time to time be supplemented, modified or amended, are incorporated herein by reference.

2.4    OTHER TERMS.  The term "document" is used in its broadest sense and encompasses agreements, certificates, opinions, consents, instruments and other written material of every kind.  The terms "including" and "include" mean "including (include), without limitation."

## 3    SECTION THREE.  REPRESENTATIONS AND WARRANTIES OF THE BORROWER.

Borrower hereby represents and warrants to Lender as of the date of this Agreement, the date the Loan Proceeds are disbursed to Borrower, and each and every date during the existence of the Loan, or any portion thereof, as the context admits or requires, that:

3.1    BORROWER'S CAPACITY.  Borrower is a California corporation duly qualified to do business in any and all states in which the nature of Borrower's business requires Borrower to be so qualified and is lawfully empowered, and Borrower possesses the capacity to enter into and carry out the terms and provisions of this Agreement.

3.2    COLLATERAL.  Borrower is or will be the lawful owner of all Collateral, free of all claims, liens or encumbrances whatsoever, other than any disclosed to Lender in writing and the security interest granted by this Agreement.  Guarantor is the lawful owner of the Residence free of all claims, liens or encumbrances whatsoever, other than those permitted by Lender in writing, and the security interest granted by this Agreement.   All information provided by Borrower to Lender, including, but not limited to, financial statements or other reports and statements whether oral or written, is and will be correct and true as of the date given; each account and contract right and any document relating thereto represents an undisputed claim or demand for the amount shown due and is not subject to any known defense, offset, counterclaim or any contingency whatsoever.

3.3    VALIDITY OF LOAN DOCUMENTS.  The Loan Documents are and shall continue to be in all respects valid and binding upon Borrower according to their terms. The execution and delivery by Borrower of and the performance by Borrower of all Borrower's obligations under the Loan Documents have been duly authorized by all necessary action and do not and will not:

3.3.1    Require any consent or approval not heretofore obtained of any other person holding any interest or entitled to receive any interest issued or to be issued by Borrower or otherwise.

3.3.2    Violate any provision of other agreements to which Borrower is bound.

3.3.3    Result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others or other encumbrance of any nature (other than under the Loan Documents) upon or with respect to any property now owned or leased or hereafter acquired by Borrower.

3.3.4    Violate any provision of any Laws, or of any judgment or order applicable to Borrower.

3.3.5    Result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under any indenture or loan or

credit agreement or any other agreement, lease, or instrument to which Borrower is a party or by which Borrower or any property of Borrower is bound or affected.

> 3.3.6   Violate any provision of the Organizational Documents.

3.4   BORROWER NOT IN DEFAULT OR VIOLATION.   Borrower is not in default under or in violation of any Laws, order, or judgment. Borrower is not in default under any obligation, agreement, instrument, loan, or indenture, whether to Lender or otherwise, or any lease. No event has occurred and is continuing, or would result from the making of the Loan or an Advance, which constitutes an Event of Default, or would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

3.5   NO GOVERNMENTAL APPROVALS REQUIRED.   Borrower does not require any authorization, consent, approval, order, license, or exemption from, or any filing, registration, or qualification with, any Governmental Agency in connection with the execution and delivery by Borrower, or the performance by Borrower, of all or any of Borrower's obligations under the Loan Documents.

3.6   TAX LIABILITY.   Borrower has filed and shall file all tax returns (federal, state, and local) required to be filed and has paid and shall pay all taxes shown thereon to be due and all property taxes due, including interest and penalties, if any.

3.7   FINANCIAL STATEMENTS.   All Financial Statements, tax returns and other financial information of Borrower which have heretofore been submitted to Lender fairly present the financial position of Borrower at the respective dates of their preparation. Since the dates of such Financial Statements, tax returns and other financial information, there has been no material adverse change in the financial condition of Borrower.

3.8   PENDING LITIGATION.   There are no actions, suits, or proceedings pending, or to the knowledge of Borrower threatened, against or affecting the Borrower, or involving the validity or enforceability of any of the Loan Documents at Law or in equity, or before or by any Governmental Agency, except actions, suits, and proceedings that are fully covered by insurance or which, if adversely determined, would not substantially impair the ability of Borrower to perform each and every one of Borrower's obligations under and by virtue of the Loan Documents; and Borrower is not in default with respect to any order, writ, injunction, decree, or demand of any court or any Governmental Agency.

3.9   VIOLATION OF LAWS.   Borrower has no knowledge of any violations or notices of violations of any Laws relating to the Property.

3.10   COMPLIANCE WITH ENVIRONMENTAL LAWS.   Borrower does not presently, and will not in the future, use, store, manufacture, generate, transport to or from, or dispose of any toxic substances, hazardous materials, hazardous wastes, radioactive materials, flammable explosives or related material on or in connection with the Property or the business of Borrower on the Property. Borrower does not presently, and will not in the future, permit any lessee on the Property to use, store, manufacture, generate, transport to or from, or dispose of any toxic substances, hazardous materials, hazardous waste, radioactive materials, flammable explosives, or related material on or in connection with the Property or the business of such lessee on the Property. ("Toxic substances," "hazardous materials," and "hazardous waste" shall include, but not be limited

to, such substances, materials and wastes which are or become regulated under applicable Laws or which are classified as hazardous or toxic under applicable Laws.)

3.11    SOLVENCY.  Borrower is and shall continue to be able to pay Borrower's debts as they mature and the realizable value of Borrower's Assets is, and at all times that Borrower may have obligations hereunder shall continue to be, sufficient to satisfy any and all obligations hereunder.

3.12    PRINCIPAL PLACE OF BUSINESS.  The principal place of business of Borrower is, and will continue to be, as set forth under Section 9.10 of this Agreement.  In the event that Borrower hereafter intends to move Borrower's principal place of business, Borrower shall first give at least thirty (30) days' prior written notice to Lender of Borrower's intention so to move, the date that such move is anticipated, and Borrower's new address.

3.13    PERMITS.  Borrower possesses all licenses, permits, franchises, patents, copyrights, trademarks, and trade names, or rights thereto, that are necessary to conduct Borrower's business substantially as now conducted and as presently proposed to be conducted, and Borrower is not in material violation of any valid rights of others with respect to any of the foregoing.

## 4    SECTION FOUR.    THE LOAN

4.1    THE LOAN.  Lender agrees, on the terms and conditions hereinafter set forth, to make the Loan to the Borrower.

4.2    INTEREST RATES; DEFAULT INTEREST.  Interest on the outstanding principal balance of the Loan shall be computed, calculated based upon a 360-day year and actual days elapsed, and shall accrue at the Base Rate.  From and after the occurrence of an Event of Default, whether by non-payment, maturity, acceleration, non-performance or otherwise, and until such Event of Default has been cured, all outstanding amounts due under the Loan (including, but not limited to, interest, costs and late charges) shall bear interest at the Default Rate.

4.3    USE OF PROCEEDS.  The Loan Proceeds shall be used by Borrower for the purposes set forth by Borrower in Borrower's loan application for the Loan, specifically, to provide permanent working capital for Borrower's business.  Borrower warrants to Lender that the proceeds of any loans or advances given by Lender for the purpose of enabling Borrower to acquire rights in, or the use of, Collateral will be used for such purpose.

4.4    PURCHASE OF EQUIPMENT.    Upon the acquisition by Borrower of any other Equipment during the term of the Loan, whether or not purchased with Loan Proceeds, Borrower shall, no later than the following Business Day, provide Lender with the serial numbers and any other identifying indicia of the Equipment.

4.5    CONDITIONS PRECEDENT TO LOAN.  The obligation of Lender to make the Loan is subject to and expressly conditioned upon the following:

4.5.1    Borrower, at Borrower's sole expense, shall deliver to Lender, at its office in Oakland, California, on or before the date of the first Advance the following, in form and substance satisfactory to Lender, in Lender's sole opinion and judgment:

| (i)     | This Agreement; |
|---------|-----------------|
| (ii)    | The Deed of Trust; |
| (iii)   | A Hazard Insurance Disclosure; |
| (iv)    | The Guaranty; |
| (v)     | Loan Disbursement Instructions; |
| (vi)    | The Financing Statement; |
| (vii)   | Agreement to Furnish Insurance; |
| (viii)  | Agreement to Furnish Insurance (Deed of Trust) |
| (ix)    | Landlord's Waiver between Borrower and the owner of the Property, in favor of Lender; |
| (x)     | True and correct copies of: Borrower's Organizational Documents, certificate(s) of fictitious business name, and Financial Statements, all of which documents must be first reviewed and approved in form and substance by Lender, its counsel, or both; |
| (xi)    | Corporate Resolution to Borrow and to Grant a Security Interest; |
| (xii)   | Review and approval by Lender, in Lender's sole opinion and judgment, of true and correct copies of Financial Statements of Borrower; |
| (xiii)  | Subordination Agreements, each executed by Willie C. Cook and Gurmail Chaggar; |
| (xiv)   | Assignment of Life Insurance Policy; |
| (xv)    | Evidence satisfactory to Lender that Borrower has entered into the California State Loan Guaranty Program, wherein, at Borrower's sole cost and expense, Lender shall be named as beneficiary of such guaranty in the amount of $200,000.00; and |
| (xvi)   | Such additional assignments, agreements, certificates, reports, approvals, instruments, documents, financing statements, consents, and opinions as Lender many reasonably request. |

4.5.2    No suit, action, or other proceeding of material consequence shall be pending or threatened which seeks to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or to obtain damages or other relief in connection therewith; and

4.5.3    Payment in full of any and all fees or other charges due under the terms of the Loan Documents, including, but not limited to, the Loan Fee, Documentation Fee, recording fees, legal fees and the premium for the Lender's Policy. which shall be due and payable prior to the making of any Advance;

4.5.4    The irrevocable commitment of the Title Company to issue the Lender's Policy to Lender;

4.5.5    Evidence satisfactory to Lender that the Residence is insured as required pursuant to the Agreement to Furnish Insurance (Deed of Trust) and the Deed of Trust; and

4.5.6    Commitment from the Title Company satisfactory to Lender in its sole opinion and judgment insuring the lien of the Deed of Trust subject only to liens and encumbrances approved by Lender in its sole opinion and judgment.

4.6     LOAN DISBURSEMENTS. Subject to the provisions of Section 4.7, the Loan Proceeds, after deduction of the Loan Fee, shall be disbursed by check from Lender pursuant to the Loan Disbursement Instructions, provided the following conditions are satisfied by no later than five (5) Business Days following the date of this Agreement.

4.6.1   The conditions set forth in Section 4.5 have been satisfied; and

4.6.2   No Event of Default has occurred.

4.7     DISBURSEMENT TO VENDOR. If any part of the Loan Proceeds is to be used for (a) the purchase of Equipment or other Collateral, or (b) refinancing an existing indebtedness, Lender may, in its sole discretion, require that the part of the Loan Proceeds to be used for such purpose disbursed only by check payable to the vendor of the Equipment or other Collateral, or to the creditor of the indebtedness being refinanced.

4.8     PRINCIPAL AND INTEREST PAYMENTS. Interest shall be due and payable monthly, in arrears, based upon the actual number of days elapsed for that monthly period, commencing October 15, 2005 and shall continue to be due and payable, in arrears, on the same day of each calendar month thereafter until the Maturity Date. In addition to the payment of interest, as set forth above, principal shall also be due and payable monthly, in monthly installments of Three Thousand Two Hundred Five and 13/100 Dollars ($3,205.13), commencing April 15, 2006, and shall continue to be due and payable, in arrears, on the same day of each calendar month thereafter until the Maturity Date. All payments due hereunder including payments of principal and/or interest, shall be made to the holder of the Loan in United States Dollars and shall be in the form of immediately available funds acceptable to the holder.

4.9     MATURITY DATE. On the Maturity Date, the entire unpaid principal balance of the Loan, and all unpaid accrued interest thereon, shall be due and payable without demand and/or notice. In the event that Borrower does not pay the Loan in full on the Maturity Date then, as of said Maturity Date and thereafter until paid in full, interest accruing on the outstanding principal balance hereunder shall be computed, calculated and accrued on a daily basis at the Default Rate, as defined below, and all unpaid principal, interest and costs or expenses related thereto shall be payable on demand.

4.10    UNPAID INTEREST, CHARGES AND COSTS. Interest, late charges, costs, or expenses that are not received by Lender within ten (10) calendar days from the date such interest, late charges, costs, or expenses become due, shall, at the sole discretion of Lender, be added to the principal balance and shall from the date due bear interest at the Default Rate.

4.11    NO OFFSETS OR DEDUCTIONS. All payments under the Loan shall be made by Borrower without any offset, decrease, reduction or deduction of any kind or nature whatsoever, including, but not limited to, any decrease, reduction or deduction for, or on account of, any offset, withholdings, present or future taxes, present or future reserves, imposts or duties of any kind or nature that are imposed or levied by or on behalf of any government and/or taxing agency, body or authority by or for any municipality, state, or nation. If at any time, present or future, Lender shall be compelled by any law, rule, regulation and/or any other such requirement which on its face or by its application requires and/or establishes reserves, or payment, deduction or withholding of taxes, imposts or duties to act such that it causes or results in a decrease, reduction and/or deduction, (as described and/or set forth above) in payment received by Lender, then Borrower shall pay to Lender

20

such additional amounts, as Lender shall deem necessary and appropriate, such that every payment received under the Loan, after such decrease, reserve, reduction, deduction, payment and/or required withholding, shall not be reduced in any manner whatsoever.

4.12 PREPAYMENT. The principal amount of the Loan may be prepaid in whole or in part without any premium and/or penalty; provided, that written notice of prepayment is received by Lender concurrently therewith. Any such prepayment shall not result in a reamortization, deferral, postponement, suspension or waiver of any and all installment payments due under this Agreement.

4.13 LATE CHARGES. Time is of the essence for all payments and other obligations due under this Agreement. Borrower acknowledges that if any payment required under this Agreement is not received by Lender within ten (10) days after the same becomes due and payable, Lender will incur extra administrative expenses (i.e., in addition to expenses incident to receipt of timely payment) and the loss of the use of funds in connection with the delinquency in payment. Because, from the nature of the case, the actual damages suffered by Lender by reason of such administrative expenses and loss of use of funds would be impracticable or extremely difficult to ascertain, Borrower agrees that five percent (5%) of the amount of the delinquent payment, together with interest accruing on the entire unpaid principal balance of the Loan at the Default Rate, as provided above, shall be the amount of damages which Lender is entitled to receive upon such breach, in compensation therefor. Therefore, Borrower shall, in such event, without further demand or notice, pay to Lender, as Lender's monetary recovery for such extra administrative expenses and loss of use of funds, liquidated damages in the amount of five percent (5%) of the amount of the delinquent payment (in addition to interest at the Default Rate). The provisions of this paragraph are intended to govern only the determination of damages in the event of a breach in the performance of Borrower to make timely payments hereunder. Nothing in this Agreement shall be construed as in any way giving Borrower the right, express or implied, to fail to make timely payments hereunder, whether upon payment of such damages or otherwise. The right of Lender to receive payment of such liquidated and actual damages, and receipt thereof, are without prejudice to the right of Lender to collect such delinquent payments and any other amounts provided to be paid hereunder or under any of the Loan Documents, or to declare a default hereunder or under any of the Loan Documents.

4.14 COST AND EXPENSES. Borrower hereby agrees to pay any and all costs and/or expenses paid and/or incurred by Lender by reason of, as a result of, or in connection with, this Agreement and all other Loan Documents, including, but not limited to, any and all attorneys' fees and related costs whether such costs and/or expenses are paid or incurred in connection with the enforcement of this Agreement and/or the Loan Documents, or any of them, the protection and/or preservation of the collateral or security for the Loan and/or any other rights, remedies and/or interests of Lender, whether or not suit is filed. Borrower's agreement to pay any and all such costs and expenses includes, but is not limited to, costs and expenses incurred in enforcing any judgment obtained by Lender and in connection with any and all appeals therefrom. All such costs and expenses are immediately due and payable to Lender by Borrower whether or not demand therefor is made by Lender.

4.15 WAIVERS. Borrower hereby waives grace, diligence, presentment, demand, notice of demand, dishonor, notice of dishonor, protest, notice of protest, any and all exemption rights against the Indebtedness and the right to plead any statute of limitations as a defense to the repayment of all or any portion of the Indebtedness, and interest thereon, to the fullest extent allowed by law, and all compensation of cross-demands pursuant to California Code of Civil

21

Procedure Section 431.70. No delay, omission and/or failure on the part of the Lender in exercising any right and/or remedy hereunder shall operate as a waiver of such right and/or remedy or of any other right and/or remedy of Lender.

4.16   <u>MAXIMUM LEGAL RATE</u>. The Loan and this Agreement are subject to the express condition that at no time shall Borrower be obligated, or required, to pay interest on the principal balance at a rate which could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge. If, by the terms of this Agreement, Borrower is, at any time, required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, then the rate of interest under this Agreement shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate, and any portion of all prior interest payments in excess of such maximum rate shall be applied, and/or shall retroactively be deemed to have been payments made, in reduction of the principal balance.

4.17   <u>APPLICATION OF PAYMENTS</u>. All payments received by Lender from or for the account of Borrower, due hereunder may be applied by Lender in the following manner, or in any other order or manner as Lender chooses, in its sole and absolute discretion: (a) first, to pay any and all interest due, owing and/or accrued; (b) second, to pay any and all costs, advances, expenses or fees due, owing and/or payable to Lender, or paid or incurred by Lender, arising from or out of the Loan; and (c) third, payment of the outstanding principal balance of the Loan. All records of payments received by Lender shall be maintained at Lender's office, and the records of Lender shall, absent manifest error, be binding and conclusive upon Borrower. The failure of Lender to record any payment or expense shall not limit or otherwise affect the obligations of Borrower under this Agreement.

4.18   <u>SUBSTITUTION OF RESIDENCE</u>. Guarantor shall have the one-time right to substitute the Residence with other real property owned by Guarantor as security for the Guaranty. Any such substitution of the Residence shall be on such terms and conditions satisfactory to Lender in its sole opinion and judgment, including, but not limited to, the location, value and state of title for such substitute real property.

## 5   <u>SECTION FIVE.</u>   <u>SECURITY INTEREST IN COLLATERAL</u>

5.1   <u>GRANT OF SECURITY</u>. To secure payment and performance of all Indebtedness and other obligations of Borrower under this Agreement and the other Loan Documents, Borrower hereby grants to Lender a continuing security interest in the Collateral. Borrower shall execute and deliver, in form acceptable to Lender, in Lender's sole opinion and judgment, all documents which in Lender's sole opinion and judgment are necessary to perfect and maintain the security interest in the Collateral, including, without limitation, assignments, financing statements, and certificates of title or registration. All property of Borrower within the definition of Collateral is security for the obligations under this Agreement and the specific identification of any property of Borrower as Collateral under this Agreement shall raise no inference that any other property is not Collateral. This is a continuing security agreement, securing all Indebtedness, including that arising after any repayment and reborrowing and that arising under successive and future transactions which shall increase, renew or modify the Indebtedness; it is without limitation as to its effective period and the obligations hereunder may be terminated only upon payment in full of all Indebtedness. Each credit granted to Borrower, including all present and future Indebtedness is and shall be granted by Lender

in reliance on this Agreement. This Agreement shall not constitute a commitment of any nature by Lender to renew or hereafter extend credit.

5.2    LENDER'S AUTHORITY. Borrower authorizes Lender, without notice or demand, unless otherwise specified herein, at any time, to: (a) upon the occurrence of an Event of Default, exercise any right or remedy of a secured party under the California Uniform Commercial Code, including, without limitation, demand for and collect, enforce, receive and receipt for any sums or property now or hereafter payable on account of the Collateral; (b) inspect Borrower's books, records and files and make copies or extracts of same under reasonable procedures acceptable to Lender and arrange for verification of any accounts directly with the account debtor or otherwise; (c) inspect any of the Collateral at any premises or facilities of Borrower or require that any of the Collateral be exhibited to Lender, or upon the occurrence of an Event of Default, be assembled or delivered at a place designated by Lender; (d) upon the occurrence of an Event of Default, enter into any agreement, compromise or settlement relating to or affecting any Collateral, whether pledged pursuant to this Agreement or any other agreement, including, without limitation, any agreement to deposit or surrender control of all or any part of the Collateral, or to accept other property in exchange for the Collateral which may be either applied to the Indebtedness or held by Lender pursuant to this Agreement; (e) make such payments and perform such acts as Lender may deem necessary to preserve and insure the Collateral or its value or Lender's security interest, including, without limitation, any action which Borrower shall have agreed to take pursuant to the terms of this Agreement; (f) assign its rights in this Agreement in full or in part; (g) accept new or additional documents, instruments or agreements relative to any Indebtedness; (h) with respect to any evidence of Indebtedness or this Agreement or any other security agreement, release, add or substitute any guarantor or third party pledgor, whether such obligor executes the original document or any renewal, extension or modification; (i) now or in the future take additional Collateral as security for any Indebtedness and exchange, substitute, enforce, waive, subordinate, modify and release in any manner any present or later acquired Collateral or Lender's security interest in the Collateral; (j) act as Borrower's attorney in fact, whether or not any default then exists, to execute and file any and all financing statements and amendments thereof describing the Collateral for the benefit of Lender; (k) upon failure of Borrower to do so upon demand, to act as Borrower's attorney-in-fact to: endorse the name of Borrower on any acceptances, checks, drafts, money orders or other instruments, deliver any and all Financing Statements relating to the Collateral as authorized agent of Borrower, record and/or file said financing statements, and to do all acts necessary to carry out the intent of this Agreement; and (l) upon the occurrence of an Event of Default, place Lender's representative on the premises to enforce this Agreement or appoint a receiver to enforce this Agreement. Lender may, but is not obligated to, exercise any authority granted herein at its sole option and any such exercise or failure to exercise shall not decrease the liability of Borrower. This authority shall remain in full force until all Indebtedness has been paid in full.

5.3    EFFECT OF WAIVERS, WARRANTIES, AND PROMISES. Borrower acknowledges that Lender has or may in the future provide financial accommodations to Borrower or Borrower's affiliates in reliance upon the unconditional pledge of the collateral as security for performance of all present and future obligations of Borrower to Lender and that the waivers, warranties and promises made by Borrower in this agreement are required to establish the obligations of Borrower to Lender. Borrower agrees that each of the waivers, warranties and promises set forth in this Agreement are made with Borrower's understanding of their significance and consequences and they are reasonable. If any waivers, warranties and promises are determined

to be contrary to any applicable law or public policy, the same shall be effective to the maximum extent permitted by law.

## 6     SECTION SIX.     BORROWER'S COVENANTS

In addition to anything else herein stated, Borrower agrees:

6.1     PROMISE TO PAY. Borrower promises to pay to Lender, or to its order, at its office of Lender identified below, or at such other place as the holder of the Loan may designate, in lawful money of the United States of America, in cash or immediately available funds acceptable to the holder hereof, the principal sum of the Loan, or so much thereof as shall have been advanced and is outstanding together with interest, on the outstanding principal balance, until paid in full in accordance with the terms, conditions and provisions of this Agreement.

6.2     COLLATERAL OBLIGATIONS. Unless otherwise excepted by this Agreement or by written amendment executed by Lender, Borrower will: (a) at all times, maintain records relating to the Collateral at Borrower's chief executive office and inform Lender of all locations of the Collateral; (b) preserve and protect all Collateral and at all times maintain the Collateral in good condition and repair, not causing or permitting any waste or unusual or unreasonable depreciation; (c) register, use, operate and control the Collateral in accordance with all relevant statutes, laws, ordinances and regulations; (d) not remove or permit the Collateral to be removed from the State of California without the prior written consent of Lender; (e) pay before delinquency all charges, liens, taxes, assessments, and insurance premiums charged against the Collateral, and upon the failure of Borrower to do so, Lender may at its option pay any such charge and add the amount paid to the Indebtedness to bear interest as provided by the underlying obligation; (f) furnish Lender with such information and reports concerning Borrower and the Collateral as Lender may request, including, without limitation, current financial statements, and in all cases furnish Lender with serial numbers and other identifying indicia of all Equipment Collateral; (g) not, without the prior written consent of Lender, sell, assign, create or permit to exist any security interest in the Collateral or lien thereon in favor of anyone other than Lender; (h) at all times maintain insurance against all risks to the Collateral, including, without limitation, fire, theft, loss and hazard, in amounts, terms, and for periods as may be satisfactory to Lender, payable to Lender as the loss payee, and providing for at least thirty (30) days' written cancellation notice to Lender; (i) promptly notify Lender of any attachment or other legal process levied against or affecting Lender's rights in any Collateral, (j) not, without prior written notice to Lender, operate under any trade names or trade styles except as disclosed to Lender in writing prior to use of such trade name or style.

6.3     INSURANCE. With respect to Collateral other than the Residence, to obtain and at all times maintain hazard and liability insurance in accordance with the Agreement to Furnish Insurance, issued by companies rated in Best's Key Rating Guide. Upon Lender's request, a certificate of insurance acceptable to Lender shall be delivered to Lender together with evidence of payment of premium thereon and an agreement to give Lender at least thirty (30) Business Days' prior notice of any material changes, termination, or expiration of the policies. With respect to the Residence, to obtain and at all times maintain hazard and liability insurance in accordance with the Agreement to Furnish Insurance (Deed of Trust) and the Deed of Trust.

6.4     RIGHT OF ENTRY. Lender and Lender's employees or agents shall have the right at all times to enter upon Borrower's premises for whatever purpose Lender deems appropriate,